# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        Plaintiff,

  v.                                                 Case No. 04-CR-269

**VICTORIA BRAHM**
        Defendant.

## SENTENCING MEMORANDUM

Defendant Victoria Brahm was employed as the book-keeper for B & B Woodworking, Inc. Between January 2001 and May 2003, she stole more than $300,000 from the company by writing checks to herself on the company account. In late 2002, one of the principals of the business, Peter Breaker, noticed a cash flow problem (but did not realize the cause). B & B had a line of credit with RidgeStone Bank, pursuant to which it could receive an advance from the Bank based on a percentage of outstanding accounts receivable. Between December 2002 and May 2003, Breaker instructed defendant to submit seventeen fraudulent invoices to the Bank, representing work not yet completed or not yet ordered by a customer, in order to obtain advances so the company could make payroll. B & B improperly obtained $240,000 pursuant to the false invoices.

In July 2003, Breaker admitted his conduct to the Bank, and an investigation commenced regarding the false invoices. After being interviewed by investigators, defendant contacted her attorney and came forward regarding her own theft. The government charged her with bank fraud related both to her embezzlement from B & B and her role in defrauding RidgeStone. She pleaded guilty to both schemes.

The probation office prepared a pre-sentence report ("PSR"), which calculated her offense level as 17 (base 6, U.S.S.G. § 2B1.1(a) (2002);[1] plus 14 for loss [$303,000 + $240,000], § 2B1.1(b)(1); and minus 3 for acceptance of responsibility, § 3E1.1), and her criminal history category as I, producing an imprisonment range of 24-30 months under the advisory guidelines. Neither party objected, but defendant requested a sentence below the range. She presented evidence that she stole the money in order to feed a serious gambling addiction, for which she had gotten treatment. She also submitted evidence of her otherwise good character, genuine remorse, and limited role in the second scheme. I agreed that these factors justified a sentence below the range. In this memorandum I set forth more fully the reasons for the sentence imposed.

## I. SENTENCING PROCEDURE

In imposing sentence, I consider the factors set forth in 18 U.S.C. § 3553(a), which include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

---

[1]The PSR used the 2004 version of the guidelines, which called for a base level of 7. U.S.S.G. § 2B1.1(a)(1) (2004). However, because defendant's criminal conduct ended in May 2003, when the 2002 version was in effect, and because the 2002 book called for a base level of 6, I used the 2002 version. See U.S.S.G. § 1B1.11(b)(1) ("If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed."). The parties agreed that the 2002 book applied.

2

> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the advisory guideline range;
>
> (5) any pertinent policy statements issued by the Sentencing Commission;
>
> (6) the need to avoid unwarranted sentence disparities; and
>
> (7) the need to provide restitution to any victims of the offense.

I consider the statutory factors sequentially. United States v. Leroy, 373 F. Supp. 2d 887, 894-95 (E.D. Wis. 2005). First, I consider the specifics of the case, i.e. the nature and circumstances of the offense and the history and characteristics of the defendant. § 3553(a)(1). Second, I consider the facts of the case in light of the purposes of sentencing and the needs of the public and any victims. § 3553(a)(2). Finally, I translate my findings and impressions into a numerical sentence. In so doing, I take into account the kinds of sentences available, the sentencing range established by the Sentencing Commission, any pertinent policy statements issued by the Commission, and any restitution due the victims of the offense. In imposing a specific sentence, I must also seek to avoid unwarranted sentence disparities. § 3553(a)(3)-(7). My ultimate task is, after considering all of the above circumstances, to impose a sentence sufficient but not greater than necessary to comply with the purposes of sentencing set forth in § 3553(a)(2). United States v. Galvez-Barrios, 355 F. Supp. 2d 958, 960 (E.D. Wis. 2005).

3

## II. APPLICATION

### A. Nature of Offense

Defendant involved herself in two fraudulent schemes. In the first, she stole more than $300,000 from her employer in order to obtains funds for her gambling. As in many of these cases, she started slowly, probably with the intent to repay what she had taken (at least if things went well at the casino), but her winnings never materialized and things got out of hand.

In the second scheme defendant played a lesser role. She submitted false invoices at Breaker's direction in order to obtain credit for the company. The company was likely in bad shape financially because of defendant's embezzlement. However, I found this offense somewhat mitigated because defendant acted primarily at Breaker's direction, believed that the invoices were primarily for actual contracts, albeit uncompleted ones, and did not personally benefit.

### B. Character of Defendant

Defendant's character was otherwise outstanding. She was forty-five years old, married for over twenty years, and the mother of two children, ages twenty-seven and nineteen. Defendant had her first child, Joshua, at the age of eighteen, and after her marriage to Joshua's father ended, she worked several jobs to support Joshua. She married her current husband, Joseph, in 1984, and the two had another child, Jake, in 1986. In the early years of the marriage, defendant stayed home with the children during the day and worked nights as a waitress to help make ends meet. After the

4

children became older, defendant obtained a job as general manager of a candy store, which she held for five years, before starting at B & B.

By all accounts, defendant was a devoted wife and mother and good neighbor. I received numerous letters attesting to her good character and positive role in the community. For example, the letters indicated that defendant taught young women in her neighborhood how to drive, looked after the elderly, and helped another man and his children through a divorce. She and her husband were members of the Tosa East Booster Club, selling concessions at football and basketball games, planning fund-raisers, and publishing a newsletter for the freshman football team. They were also involved with the Tosa Junior Raiders Youth football program, organizing concessions, fitting uniforms, and organizing equipment. After Josh was involved in a serious car accident in 1999, defendant for months nursed him back to health, turning the family living room into a hospital room. Even during this trying time, she provided assistance to an elderly neighbor after her husband died. Defendant's own elderly mother further indicated that defendant was always available to help her. The other letters from family members and friends indicated that defendant was the glue that held her family together, and a strong and positive influence in her community.

Defendant had no prior record. As noted, her criminal conduct in the instant case stemmed from her serious gambling addiction. Defendant's husband indicated (and the PSR confirmed) that defendant's gambling started slowly in the 1990s, and became more frequent and damaging after Josh's car accident in 1999. Between 2000 and 2003, the years of the embezzlement, her gambling spun out of control. After she confessed to her crime in the fall of 2003, defendant attempted suicide by

taking pills. The PSR indicated that she was transported by ambulance to Froedert Memorial Hospital, where she "arrested" twice in the emergency room and had to be shocked and intubated. She "coded" four times in the ICU, and had to be shocked and given magnesium. Upon her release from the hospital, she was transferred to the county mental health complex for further evaluation and diagnosed with "adjustment disorder with depressed mood and pathological gambling."

Since that time, defendant had taken significant steps in addressing her gambling problem and her other mental health issues. She had been seeing a therapist, Dr. Jeanne Herzog, for about two years prior to sentencing. Dr. Herzog indicated that defendant had been forthright and cooperative in treatment, followed through with Gambler's Anonymous group participation, and had strong family support. Dr. Herzog opined:

> Much of Ms. Brahm's history with gambling has been related to self-esteem, confusion about her life and seeking outlets for her emotions. In therapy, she has learned to improve her self-esteem, accept responsibility for her actions without self-deprecation, become clearer about her role in her life and appropriately regulate her emotions.

(May 25, 2000 Letter, Dr. Jeanne Herzog.) She further opined that defendant understood the gravity of the crime and was unlikely to re-offend.

Corroborating Dr. Herzog's statements, the evidence showed that defendant and her husband were heavily involved in Gambler's Anonymous, regularly led meetings, and had become role models in the organization. Defendant's husband also regularly attended "Gam-anon" meetings, which provide support for those with family members who are compulsive gamblers (as Alanon does for the families of alcoholics).

6

**C.     Needs of Public and Victim**

There was no evidence that defendant was dangerous, and so long as she dealt with her gambling she was unlikely to re-offend. However, there was a need for some confinement to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and deter others. The bank was owed $240,000 in restitution.[2]

**D.     Consideration of Guidelines and Imposition of Sentence**

The guidelines called for a prison term of 24-30 months, but under the circumstances I found that range greater than necessary. For several reasons, I found that a sentence served primarily in the community was appropriate.

First, it was clear from defendant's character and background that she embezzled money due to her gambling problem. She did not commit the crime out of greed or to fund a lavish lifestyle. There was no element of serious criminal thinking present. The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders 12 ("DSM-IV") lists gambling addiction as a mental disorder and recommends treatments for the addiction. Diagnostic and Statistical Manual of Mental Disorders 615-18, § 312.31 (4th ed. 1994).[3] Defendant had been in treatment for nearly two years and was

---

[2]Because B & B no longer existed at the time of sentencing, the government did not seek restitution on its behalf.

[3]Studies have shown that gambling leads to an increase in divorce, bankruptcy, and suicide. "Problem gamblers also face financial and other problems that frequently lead to anti-social behavior. Importantly, the number of crimes committed as a result of compulsive gambling has created new problems for social institutions, especially the courts." Ronald J. Rychlak and Corey D. Hinshaw, Symposium: Gaming Law and Technology: From the Classroom to the Courtroom: Therapeutic Justice and the Gaming Industry's Impact on Law, 74 Miss. L.J. 827, 829 (Winter 2005); see also United States v. Yi Ching Liu, 267 F. Supp. 2d 371, 373 (noting expert testimony that 30-40% of pathological gamblers are involved in illegal activities to support their addiction). New York

7

progressing well. Dr. Herzog opined that she was unlikely to re-offend. The best way to protect the public, § 3553(a)(2)(C), and provide for defendant's correctional treatment needs, § 3553(a)(2)(D), was to impose a sentence served primarily in the community, which would ensure that she was monitored and continued with treatment. A sentence of two plus years in prison, during which she would likely receive no meaningful treatment for her addiction, would have set back her progress and would have been greater than necessary to protect the public and satisfy the other goals of sentencing.[4]

Second, including the full loss amount from the second scheme resulted in an imprisonment range that somewhat overstated the seriousness of defendant's criminal conduct. Breaker instigated the second scheme, and defendant received none of the proceeds. Under such circumstances, the court is empowered to mitigate the effects of a high loss figure. See, e.g., United States v. Samaras, No. 03-CR-46, 2005 U.S. Dist. LEXIS 23759, at *10-11 (E.D. Wis. Oct. 3, 3005) (imposing sentence below range because

---

recently created the first "gambling treatment court," the premise of which is "that pathological gambling is a disease, and that it is better to seek real solutions to the problems facing compulsive gamblers than merely to mete out punishment without consideration of what may have been the root cause of the crime." Rychlak and Hinshaw, supra, at 830-31.

[4] Defendant did not argue, and I did not find, that she committed the crimes while suffering from a diminished mental capacity. See U.S.S.G. § 5K2.13; see also Yi Ching Liu, 267 F. Supp. 2d at 374-75 (departing downward under § 5K2.13 based on defendant's gambling addiction). Rather, I found that defendant's gambling addiction was relevant under § 3553(a)(2), as discussed in the text. Although the Sentencing Commission in its October 27, 2003, PROTECT Act-inspired amendments to the guidelines forbid departures based on gambling addiction, U.S.S.G. § 5H1.4 (2004), I saw no impediment to considering defendant's gambling problem under § 3553(a). First, the guidelines are no longer mandatory, so such prohibitions in the policy statements, while worthy of consideration, are not binding. Second, as noted above, I did not "depart" in the manner the Commission recently forbid. Finally, in the present case I used the 2002 version of the guidelines, which in any event did not prohibit such departures.

8

defendant played no part in setting loss amount and profited no more than in his lawful business dealings); United States v. Ranum, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (imposing non-guideline sentence where loss amount produced unnecessarily high range and defendant did not profit from offense); cf. United States v. Forchette, 220 F. Supp. 2d 914, 925-27 (E.D. Wis. 2002) (departing downward where defendant did not devise the scheme and profited minimally). It is true that defendant's embezzlement likely created the circumstances for the bank fraud, but she was punished for the $300,000 she stole.

Third, defendant displayed tremendous remorse for what she did. After an investigator interviewed her about Breaker's bank fraud scheme, she contacted her attorney and came forward concerning her embezzlement, which had not come to light. She then attempted suicide. Obviously, she was wracked with guilt over what she did. Courts may consider such voluntary admissions of criminal conduct and extraordinary expressions of remorse in setting the sentence. See, e.g., United States v. Milne, 384 F. Supp. 2d 1309, 1311-12 (E.D. Wis. 2005) (imposing sentence below guideline range in bank fraud case where defendant voluntarily admitted his crime to the bank); cf. United States v. Jaroszenko, 92 F.3d 486, 491 (7th Cir. 1996) (holding that court may depart based on extraordinary remorse). Such expressions go to the defendant's character and the likelihood that she will re-offend. 18 U.S.C. § 3553(a)(1) & (a)(2)(C).

Fourth, defendant owed substantial restitution to the Bank. Given her employment history, she had the ability to earn and repay the bank, which she could better do with a sentence served primarily in the community. See 18 U.S.C. § 3553(a)(7) (stating that court must consider need to provide restitution to victims of the offense in imposing sentence);

9

see also United States v. Peterson, 363 F. Supp. 2d 1060, 1062-63 (E.D. Wis. 2005) (imposing non-guideline sentence to enhance defendant's ability to make restitution).

Finally, as evidenced in the many letters I received, defendant was a significant asset to her family and the community. Based on her history of good works and her importance to her family, a sentence served primarily in the community was proper. See, e.g., United States v. Page, No. 04-CR-106, 2005 U.S. Dist. LEXIS 19152, at *12 (E.D. Wis. Aug. 25, 2005) (imposing sentence below range in part because guidelines did not account for defendant's positive personal qualities); see also Ranum, 353 F. Supp. 2d at 986 (noting that guidelines fail to account for many positive personal characteristics).

However, some confinement was necessary to reflect the seriousness of the crime and to deter others. I found it appropriate to impose a term greater than what Breaker received (five months prison followed by five months home confinement), given defendant's additional criminal conduct. I found that imposing a sentence within the same range as Breaker (10-16 months), but at the high end, was sufficient but not greater than necessary.[5] Therefore, I imposed a split sentence of eight months imprisonment followed by eight months home confinement. This sentence provided for a total period of confinement of sixteen months, just eight months below the advisory range. Because this difference was supported by the facts of the case it did not create unwarranted disparity.

---

[5]This range was five levels lower than that produced by the advisory guidelines. A reduction of one level for each of the factors listed above produced the same result.

10

## III.  CONCLUSION

I therefore committed defendant to the custody of the Bureau of Prisons for a period of eight months.  Based on her financial situation and the amount of restitution due I found that she did not have the ability to pay a fine.  She owed restitution in the amount of $240,000 to RidgeStone Bank, 13925 W. North Avenue, Brookfield, WI, joint and several with Breaker, which I ordered her to pay at a rate of not less than $100 per month commencing thirty days after her release from prison.

Upon release, I also ordered her to served a supervised release term of five years. I imposed the maximum term given the amount of restitution and to ensure that defendant continued to deal with her treatment needs.  As conditions, I ordered that she refrain from any gambling, attend Gambler's Anonymous meetings, not hold employment having fiduciary responsibilities without first notifying the employer of her conviction or hold self-employment having fiduciary responsibilities without consent of the supervising probation officer, participate in a mental health treatment program, and serve an eight month period of home confinement.  Other conditions appear in the judgment.

**SO ORDERED**.

Dated at Milwaukee, Wisconsin, this 9th day of November, 2005.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge